Filed 7/11/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE ex rel. COLIN BURNS, as City Attorney, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> NANCY WOOD, <br><br> Defendant and Appellant. | G061001 <br><br> (Super. Ct. No. 30-2020-01164408) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Derek W. Hunt, Judge.  Reversed and remanded with instructions.

UCI Law Civil Rights Litigation Clinic, Paul Hoffman, Melanie T. Partow; Elder Law and Disability Clinic and Brooke Weitzman for Defendant and Appellant.

Harper & Burns, Colin Burns, and Alexandra Halfman for Plaintiff and Respondent.

*          *          *

The city of Fountain Valley (the City) seeks to prohibit Nancy Wood, an indigent homeless woman, from residing in the City's Mile Square Park (the Park), which is near the hospital where she receives treatment for cancer and heart disease. At the time these events occurred, the City had no homeless shelter.

At the outset we observe that homelessness is a difficult, complex issue in 21st century America. Both sides of the debate—property owners and homeless advocates—can muster compelling arguments in support of their positions. Both are entitled to due process. Communities throughout this country are struggling to find solutions.[1]

Having said that, we set out the procedural path this case has traveled before arriving in our court. The City first filed a criminal complaint against Wood which entitled her to representation by appointed counsel. In that case, she conceded she was residing in the Park in violation of the City's ordinance, but argued necessity as a defense.[2]

---

[1]     We acknowledge the United States Supreme Court decided *City of Grants Pass v. Johnson* (June 28, 2024, No. 23-175) __ U.S. __ [2024 WL 3208072]) after we heard oral argument in this case. We conclude *Grants Pass* changes neither our analysis nor our disposition in this matter.

[2]     Wood has requested that we take judicial notice of documents in the criminal cases filed against her by the City, as well as the 2021-2022 Orange County Grand Jury report assessing the county's efforts to address homelessness, the City's response to that report, and a Centers of Disease Control and Prevention COVID Data Tracker. We grant the request as to the requested documents in criminal Case No. 20WM04865 (exhibit Nos. 1 and

2

While that criminal case was pending, the same City attorneys who were prosecuting Wood criminally filed this civil lawsuit for nuisance against her. Due to its civil nature, Wood was not entitled to appointed counsel in this case; she therefore defended herself against the same lawyers who were simultaneously prosecuting her criminally. The trial court was aware of this.

In this case, Wood again conceded her violation of the City's ordinances and argued necessity as a defense. Due to COVID restrictions, all proceedings were conducted remotely, with Wood first trying to participate from a Starbucks, and later from the Park, where she was still residing at the time of trial. When Wood informed the court that she had not received the City's trial exhibits, the court observed there was a record that the City had served her by mail (at a local soup kitchen), and moved on.

At the conclusion of trial, the court found Wood culpable for public nuisance because she was residing with her belongings in the Park, in violation of city ordinances. The court then waited five months before issuing its judgment prohibiting Wood from having her "illegal encampment"[3] in the Park at any hour of the day, and from being in the Park during the hours it is closed to the public. Less than a week after the court entered its judgment, Wood was acquitted in the criminal nuisance case.

---

8-13), which the record makes clear was known to the City and the court during the proceedings below. We deny the balance of the request.

[3]    The judgment defines Wood's "illegal encampment" as "camp paraphernalia, consisting of multiple large tents, a mattress, tarps, luggage, lawn chairs, an inflatable mattress and/or other miscellaneous personal property items . . . ."

Wood argues the judgment should be reversed because the trial court erred by failing to stay the civil action until after the City's concurrent criminal prosecution of her was completed. Wood also argues the court erred by refusing to consider her evidence related to the same necessity defense she successfully relied on in the criminal case. Finally, Wood argues the City improperly sought punitive injunctive relief in this case, in violation of the constitutional double jeopardy prohibition.

We conclude the trial court abused its discretion in failing to stay this case pending the outcome of Wood's criminal case. We consequently reverse the judgment and remand the case with directions that the trial court reconsider the propriety of the injunction.

For the guidance of the court on remand, we observe that the court appears to have erred by ignoring the evidence supporting Wood's defense of necessity in deciding to issue the injunction in this case. Whether or not the Eighth Amendment defense of "necessity" applies in this civil case—an issue we do not reach—the decision to issue an injunction in a civil case involves an exercise of the court's equitable jurisdiction; the court is therefore obligated to consider all relevant evidence in determining whether, and to what extent, an injunction is the appropriate remedy for the wrong established. The circumstances supporting Wood's claimed need to reside in the Park, and the extent to which she actually infringes on the rights of other members of the public, are relevant considerations for the trial court on that issue.

## FACTS

Plaintiff's complaint, filed in October 2020, alleges that Wood had been residing in the Park since at least February of 2020. Wood's

4

encampment allegedly blocked the general public from using the Park when it was open for its intended purpose; it also allegedly impeded the City's ability to maintain the park.

The complaint further alleges Wood was warned by police that she was in violation of the City's ordinances when she stayed in the park past the posted closing time, and that officers provided her with information and resources on homeless assistance programs and emergency housing. In March and April 2020, Wood was cited for being in the park after its posted closing time. In May and June 2020, Wood was arrested for violating the City's ordinances. As a result, police seized her personal property.

The City's civil complaint set forth a cause of action for public nuisance abatement and sought an injunction which would prohibit Wood from continuing to maintain a public nuisance in the Park.

At the time the City commenced this action for abatement of the nuisance, it was already prosecuting its criminal action against Wood based upon the same conduct alleged to constitute the nuisance in this case, i.e., her presence in the Park with her personal belongings after its posted closing time. Wood was represented in the criminal case by the public defender. In that case, she did not dispute living in the Park in violation of the City's ordinances but pleaded the defense of necessity. The City was represented by the same counsel in both the criminal and civil cases, and in this appeal.

In response to the civil complaint, Wood filed a lengthy document styled a "Motion to Dismiss" and alternatively an "Answer" and a "General Denial and Demur[r]er." Among other things, Wood argued she had previously been charged criminally with the same misconduct alleged in the civil complaint. She cited *Martin v. City of Boise* (9th Cir. 2019) 920 F.3d 584

5

(*City of Boise*) for the proposition that "the necessitated behavior of homelessness cannot be subject to the criminal process."

Wood argued that *City of Boise* and other federal precedents "protects homeless people's right to sleep on the sidewalk or in public parks if no other shelter is available"; she also noted the City then had no homeless shelter and asserted that the fliers given to her by the City's police, purporting to provide homeless resources, were useless and "defunct," having been published in 2010. Wood claimed the information listed one shelter in Santa Ana which had closed, and two others in Santa Ana for which she did not qualify.

In January 2021, the trial court denied Wood's motion to dismiss, overruled her demurrer, accepted her general denial for filing, and set a trial date for June 14, 2021.

In April 2021, Wood petitioned ex parte for a protective order restraining the City from enforcing its park curfew ordinances against her. She argued the City's confiscation of her belongings included "life sustaining medications for known terminal illnesses (cancer and heart disease)" and that its actions were interfering with her "life sustaining treatment regimen[]s." She again cited *City of Boise.*

Wood did not appear at the hearing on her ex parte application, and the court took it off calendar. The court's minute order stated the scheduled trial date of June 14 remained on calendar and that the trial would be conducted as a "remote Court Trial via Zoom."

The bench trial was conducted on June 14 as scheduled. The court commented that the City had arrested Wood and seized her personal property as part of the criminal case before they sued her for nuisance; Wood informed the court she had been jailed six times. The court replied it was

6

"focusing on . . . [her] personal property." It noted that although Wood did not file a cross-complaint in the civil case, it was "ordering [the City] to refrain from destroying any of [Wood's] personal property of which it is currently in custody," adding that was "the best [it] could do" for her. The court then said it believed the case was about "whether or not you're occupying public property after hours and have done so in the past, and whether or not the City can achieve a remedy, which in this case would be an injunction telling you to stay off the property hence forward."

Wood initially attempted to participate in the trial from a Starbucks, but she had difficulty maintaining an internet connection. As a result, the court suggested it might allow her to appear in person. That possibility was not pursued after Wood relocated to the Park and was able to maintain a digital connection there.

The City's counsel informed the court she had served Wood with a binder of trial exhibits, and the court clerk told the court the file included evidence of proof of service by mail at a specified address, which the parties agreed was a local soup kitchen. Although Wood claimed she did not receive the exhibits, the court stated that because "apparently [counsel] did her duty and sent it off to you," it would "kind of assume that you got those documents."

The court again informed Wood that the City's lawsuit "has to do with whether or not you're occupying public property after hours and have done so in the past, and whether or not the City can achieve a remedy, which in this case would be an injunction telling you to stay off the property hence forward." Wood responded that she understood, but argued "those two city ordinances have been superseded by . . . different courts saying that homeless

7

people are entitled to the necessitated behavior of homelessness regardless of the curfew code and other codes."

The court responded, "I have right now a thousand cases on my inventory. So I don't have time to go looking up everybody else's defense. That's why I count on the lawyers to do it for me." He reminded her "that's why I've told you in the past, you really need a lawyer to orient me to where I should look to see whether or not you have a good defense here." Wood responded that she had cited her authorities in an earlier brief. The court responded, "maybe over the lunch hour, I'll try to look into the court file and find your briefing on that and see what I can do."

Following the break, the City called its first witness, its community services director, who testified about the Park and its signage which indicated the hours it was open to the public. The director stated Wood's encampment was in an area the public uses for recreational purposes; he could not say whether the public was able to use the area when she was present. He said he had received complaints about Wood electronically from community residents, about "lack of access to recreational amenities and enforcement of laws." On cross-examination, the director clarified that the recreational amenity Wood was obstructing was "the park space." He acknowledged she was not interfering with any areas designated for specific activities, such as softball or soccer.

The City next offered the testimony of a police officer who had encountered Wood on several occasions. The officer stated his job included "working as the homeless liaison officer," which included " providing outreach to individuals in need in the community." He testified he encountered Wood at her camp, which was "near field 5," in February 2020. He informed Wood "that she was no longer allowed to stay in the Park overnight due to a

violation of the Fountain Valley Municipal Code . . . ." The officer offered Wood a "ride to a homeless shelter," which she refused. He also encountered Wood in April 2020, again near field 5. He warned her she needed to leave the area because the grass needed to be reseeded.

On April 27, the officer again encountered Wood and offered her a ride to a homeless shelter; she again refused. On May 12, the officer arrested Wood for being in violation of the municipal code; her tent was taken down pursuant to the code provision prohibiting the storage of property in the Park overnight. Wood's property, which included bicycles, large tarps, chairs, sleeping bags, blankets, pillows, and clothing was taken to the City yard for storage.

The officer testified he had received multiple "complaints [about Wood] from various citizens that were upset about their safety [and] about the cleanliness of the Park." The officer confirmed that despite her citations, arrests, and the seizure of her property, Wood continued to reside in the Park.

On cross-examination, the officer acknowledged the City had no homeless shelter; he said "we do provide transportation to shelters that are within the central services planning area. [¶] And we have multiple other locations that we can call and check on bed availability." He explained to Wood she could be transported to a facility; he said he checked on bed availability. He did not recall any discussions about whether Wood met the criteria for the shelters.

A second police officer testified that he had acted as a "cover officer," participating in encounters with Wood at the request of a fellow officer. He acknowledged that when confronted by the officers, Wood

9

consistently responded that their efforts to oust her from the Park and enforce the Park curfew were in violation of federal law.

During her testimony, Wood denied the City's claim that she impeded its ability to reseed the grass because she "move[d] around a lot." She also denied that her camp obstructed any recreational use of the Park. The court interrupted Wood to clarify that "[t]he way I'm sizing it up is that your main position is that your constitutional rights have been violated and that's your defense for this entire case. [¶] And if I'm right about that, what that means is . . . you're not arguing that you weren't in the Park or that you weren't camping in the park . . . . [¶] You're saying that may be true, but you're violating my constitutional rights by having made me move." Wood responded, "That's exactly what my position is."

When Wood attempted to discuss the federal case law she was relying on, the court again addressed the fact that she was self-represented: "I told you from time to time, you know, it would be nice to have a lawyer on this." Wood responded, "Yeah, you're right. You're right. But I can't afford one. So here I am." In response to the court's inquiry, Wood said she was homeless not by choice. She said, "I own nothing. I have the tent in the park and that's it."

When the court asked Wood about the police officer's claim that he had offered her transportation to a homeless shelter, she testified the officer suggested she go to the Santa Ana bus depot, which was then a walk-in shelter which "had been condemned and denounced by American Civil Liberties. And they stated that it's a very dangerous place." The officer also suggested she go to Wise Place and Mercy House; she responded that she qualified for neither because they required that residents be employed. The

10

other shelters on the list given to her by the officer "specifically accommodate men or families, but certainly not me."

Wood testified that she suffered from cancer and heart disease. She explained she could not reside on "a mattress on the floor type of shelter, . . . because . . . my health problems are pretty debilitating, and I have to be on a regimen to take care of them." She stated she was being treated at Fountain Valley Hospital, which was a short distance from the Park, that her heart condition required surgery, and she was at the hospital at least once per week. She said she could not reside in a shelter that did not allow her to maintain her regular access to the hospital.

Wood further explained that "because of my health considerations, I don't want to be transported back and forth, you know, from outlying areas. I need to be near Fountain Valley Hospital. . . . I think that . . . dominant consideration has to be my main objective in being here. [¶] . . . It's a very demanding situation being ill." She said she was doing everything in her power to find housing "that's more permanent than a tent in the park."

After both sides had rested their cases, the City argued *City of Boise* did not abrogate its ability to regulate its parks. The City also claimed *City of Boise* does not apply to people "who have alternative shelter space available" and said that Wood also had the option of sleeping in "other public spaces, which are open, like the sidewalk."

The court replied, "Let me ask you this . . . it seems to me that the Eighth Amendment, which is what Ms. Wood is relying on, is pertinent to criminal cases. [¶] And . . . there is a Supreme Court case called 'Ingraham against Wright' . . . in which the United States Supreme Court says it would be wrong to extend the Eighth Amendment into civil cases." "So what I've got

11

is a case, a pretty controversial case from the Ninth Circuit, the '*Boise*' case, which does extend or appears to extend the Eighth Amendment into the civil area."

During her argument Wood repeated her reliance on the federal authorities which prohibit the City from enforcing its ordinances prohibiting her from staying in the Park after hours if there was no alternative shelter offered in the City.

The court then ruled: "while I can obviously sympathize with your situation, . . . that doesn't mean that you were the victim of a constitutional violation.  [¶]  I just don't find it."  The court added, "I think that you're attenuating the law, sort of stretching it to cover your situation. And I don't think the law has gone there, not even in the '*Boise*' case. [¶] . . . [¶]  So I'm ruling against you."

The court invited the City to submit a proposed judgment, which it did on July 20, 2021.  When the court did not act on that filing, on October 7, 2021, the City submitted another proposed judgment, which the court signed on November 3, 2021—nearly five months after the trial concluded.

Five days after the court issued its judgment, Wood was acquitted of the criminal nuisance charge.

## DISCUSSION

1.    *Public Nuisance Law*

Civil Code section 3479 defines a nuisance as: "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life

12

or property." As explained in *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334, 341, "[a] nuisance may be a public nuisance, a private nuisance, or both." A nuisance is public when it "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.)

"'[A] nuisance per se arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance. . . .  [T]o rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law.' [Citation.]  '[W]here the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made . . . .' [Citation.] "'Nuisances per se are so regarded because no proof is required, beyond the actual fact of their existence, to establish the nuisance." [Citations.]'" (*People ex rel. Trutanich v. Joseph* (2012) 204 Cal.App.4th 1512, 1524.)

Conduct that qualifies as a public nuisance may be punishable criminally and enjoined civilly pursuant to the court's equitable jurisdiction. (Civ. Code, § 3491; *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1108-1109 ["Acts or conduct which qualify as public nuisances are enjoinable as civil wrongs *or* prosecutable as criminal misdemeanors"].)  The fact that acts which constitute a public nuisance can qualify as both a criminal and a civil wrong "derives not from their status as independent crimes, but from their inherent tendency to injure or interfere with the community's exercise and enjoyment of rights common to the public.  It is precisely this recognition of—and willingness to vindicate—the value of community and the collective

13

interests it furthers, rather than to punish criminal acts, that lies at the heart of the public nuisance as an equitable doctrine." (*Acuna, supra*, at p. 1109.)

Because the issuance of an injunction is an exercise of the court's equitable authority, the court must balance the interests of the two sides in deciding whether to grant such relief. "A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute. This principle of equity jurisprudence has been applied in a variety of contexts in which the court is called upon to exercise equitable power." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180; *People ex rel. Busch v. Projection Room Theater* (1976) 17 Cal.3d 42, 57 [""An abatement of a nuisance is accomplished in a court of equity by means of an injunction *proper and suitable* to the facts of each case""]; see also *People v. Roberts* (1956) 47 Cal.2d 374, 377 ["Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose"].)

Not every finding of nuisance will warrant an injunction. To be enjoinable, a nuisance must be both substantial and unreasonable. (*In re Englebrecht* (1998) 67 Cal.App.4th 486, 492.)

If the court issues an injunction to abate a public nuisance and the defendant does not comply, the government can enforce the injunction through a criminal action for contempt of court. If the defendant is found guilty of willful contempt, the consequences can include punishment such as fines and incarceration. (See *City of Vernon v. Superior Court* (1952) 38 Cal.2d 509, 512 [City Council members held in contempt for willful failure

14

to comply with injunction; fined and sentenced to jail].)  Thus, a civil injunction can also be a vehicle for imposing criminal sanctions.

2.  *Whether the Court Abused Its Discretion by Failing to Stay this Case*

Wood raises several claims of error in this case; to some extent they overlap.  Her argument that requiring her to defend against the civil case at the same time she was a defendant in a criminal case was a violation of her rights to due process and equal protection is related to her claim that the court abused its discretion by not staying this case until conclusion of the criminal matter.

We agree that under the circumstances of this case, a stay was required.  We reach that conclusion despite our awareness that, as Wood concedes, the court has no absolute obligation to stay a civil case whenever a parallel criminal case is pending.  (See *Federal Savings and Loan Ins. Corp. v. Molinaro* (9th Cir. 1995) 889 F.2d 899, 903.)  The court, nonetheless, has the authority and discretion to do so when the circumstances indicate that a stay is warranted, as they did here.  (Code Civ. Proc., §§ 128-130; *Pacers, Inc. v. Superior Court* (1984) 162 Cal.App.3d 686 (*Pacers*) [holding trial court abused its discretion by failing to stay civil case until expiration of criminal statute of limitations].)

A trial court must ensure the fairness of any proceeding conducted before it.  "The court's powers are not delineated by the wishes of litigants.  Rather, the court has the inherent power to control the proceedings before it and to make orders which prevent the frustration, abuse, or disregard of the court's processes."  (*Conn v. Superior Court* (1987) 196 Cal.App.3d 774, 785.)  The trial court here failed to discharge this responsibility.

15

As explained in *Pacers*, there is an "inherent unfairness" in requiring a party to simultaneously defend civil and criminal cases arising out of the same conduct because it "compel[s] disclosure of a criminal defendant's evidence and defenses before trial. Under these circumstances, the prosecution should not be able to obtain, through the medium of the civil proceedings, information to which it was not entitled under the criminal discovery rules." (*Pacers, supra*, 162 Cal.App.3d at p. 690.)

The City argues the two cases do not arise out of the same conduct because the criminal prosecution was based on specific incidents of past violations of the City's ordinances, while the injunction seeks to prohibit future violations. We disagree.

Wood's criminal and civil cases both resulted from her residing in the Park. We reject the City's assertion that the civil case was distinguishable from the criminal case because it relied not only on her presence in the Park, but also on her storage of belongings, and because it relied on Civil Code section 3479, prohibiting general public nuisance. "'The decision whether to stay civil proceedings in the face of a parallel criminal proceeding should be made "in light of the particular circumstances and competing interests involved in the case."'" (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 885 (*Avant!*).)

The parties agree that *Keating v. Office of Thrift Supervision* (9th Cir. 1995) 45 F.3d 322 sets forth the appropriate test to apply as a trial court considers whether to issue a stay. The court should consider "'the extent to which the defendant's fifth amendment rights are implicated.' [Citation.] In addition, the decisionmaker should generally consider the following factors: (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice

16

to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation." (*Id.* at pp. 324-325; see also *Avant!, supra*, 79 Cal.App.4th at p. 885.)

Consideration of these factors required the issuance of a stay here. Wood's potential peril from participating in the civil case was increased as a result of her status as a pro per litigant. Although she was entitled to appointed counsel in the criminal case, and availed herself of that right, she had no such option in the civil case, and no resources to hire private counsel. That required Wood to deal directly with the same lawyers who were prosecuting her in the criminal case—lawyers who were otherwise ethically prohibited from communicating directly with her as a represented criminal defendant.[4]

Although the City argues it had a significant interest in proceeding expeditiously, it points to no facts which support that assertion. And the trajectory of this case suggests otherwise. Wood had been living in the Park since 2017, and she continued to live there until the time of trial in June 2021. There is no evidence Wood was disruptive or violent, or that her presence significantly disrupted or prevented any public activities. And the

---

[4] The record reflects the court was aware the same lawyers were representing the City in both cases, as the court stated it had told the City's counsel it was "ordering [the City] to refrain from destroying any of [Wood's] personal property of which it is currently in custody." The fact the court also told Wood that was "the best [it] could do" for her suggests the court may not have recognized it had the power to assist Wood further by staying the civil case until the criminal prosecution was completed.

17

court's five-month delay in issuing the injunction after the trial concluded suggests the court itself did not view the case as one that required an immediate resolution.

The next factor to be considered is the burden which the proceeding may impose on the defendant. Here, in addition to being required to interact with the lawyers who were prosecuting her for a crime, the court's COVID protocols in place at the time meant that Wood was not allowed to attend her trial in person, and being homeless with no fixed address, she was handicapped in her ability to maintain reliable remote communications and to receive documents mailed to her.

The City counters that because Wood was able to appear remotely for the trial, she was not disadvantaged by the COVID restrictions; it then asserts, without citation to the record, that Wood "had substantial time to seek an attorney, *but she did not want one*." (Italics added.) The City also claims that "[d]ragging out the case for no reason would have prolonged [Wood's] stress and taxed her limited resources, pending the resolution of the matter. The criminal prosecution against [Wood] would not have disposed of this action." Once again, we disagree.

Wood is an indigent homeless woman. As we discussed with counsel during oral argument, there is no evidence in our record that Wood "did not want" a lawyer. To the contrary, she testified that she wanted a lawyer, but could not afford one.[5] There is also no evidence that delaying the trial would have prolonged Wood's stress or taxed her resources.

---

[5] Both the City and the court were aware that Wood is indigent and homeless. We reject the City's assertion that the court assisted Woods as much as it reasonably could. Not so. In fact, the court repeatedly expressed its irritation at the fact Wood was representing herself.

18

The City's position on the last two factors, i.e., "the interests of persons not parties to the civil litigation" and "the interest of the public in the pending civil and criminal litigation" restates its claim that the City's residents have a "strong interest in the resolution of this action [because they] desired the abatement of this longstanding nuisance." The trial court's lengthy delay in issuing the injunction, after announcing its decision, suggests it did not share that sense of urgency.

For all of the foregoing reasons, we conclude the court abused its discretion by failing to stay this civil case.

3.      *Court's Failure to Consider Wood's Evidence of Necessity*

While both sides argue about whether the Eighth Amendment defense of "necessity" applies in a civil nuisance case, we conclude the issue is a red herring. As we have explained, the issuance of an injunction is an equitable act, and the court must consider the interests of both parties in fashioning an appropriate remedy for the nuisance established in this case.

While the City has the right to enforce its ordinances and a significant interest in maintaining the public's access to their recreational facilities, Wood is also a resident of the City who needs a place to reside that maintains her access to the hospital where she is receiving medical treatment. These competing interests must be considered, weighed, and balanced.

The trial court does not appear to have recognized those complexities. On remand, these issues must be addressed. To the extent the City seeks to rely on the fact Wood has alternative shelter options available to her, it must support that claim with evidence. It is not enough to demonstrate that a police officer had confirmed a shelter space would have

19

been available to her on specific dates in February and March of 2020, more than a year before the trial in this case.

## DISPOSITION

The judgment is reversed, and the case is remanded to the trial court with directions to reconsider the matter in light of (1) Wood's acquittal in the criminal case, and (2) all relevant evidence related to appropriate equitable factors to be considered in determining the propriety and extent of injunctive relief.  Wood is to recover her costs on appeal.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

20